## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

–––––––––––––––––––––––––––––––––X

NIPPON LIFE INSURANCE COMPANY OF      Case No.: _____
AMERICA,

Plaintiff,

v.

OPENAI FOUNDATION, and OPENAI GROUP
PBC,

Defendants.

–––––––––––––––––––––––––––––––X

## <u>NIPPON LIFE INSURANCE COMPANY OF AMERICA'S COMPLAINT</u>

NIPPON LIFE INSURANCE COMPANY OF AMERICA (hereinafter referred to as "NIPPON"), by and through its undersigned counsel, for its Complaint against OPENAI FOUNDATION and OPENAI GROUP PBC (hereinafter collectively referred to as "OPENAI") alleges, on knowledge to its own actions and otherwise upon information and belief, as follows:

### PRELIMINARY STATEMENT

1.      NIPPON brings this lawsuit against OPENAI FOUNDATION and OPENAI GROUP PBC under the common and statutory laws of the State of Illinois for: a) tortious interference with a contract; b) the unlicensed practice of law; and c) abuse of process. This action arises from OPENAI's collective conduct, through its artificial intelligence ("AI") chatbot program, ChatGPT, in providing legal assistance to a user, Graciela Dela Torre (hereinafter referred to as "Dela Torre"), without licensure. As Dela Torre's legal assistant and advisor, OPENAI intentionally induced and facilitated Dela Torre's breach of a valid and enforceable settlement agreement with NIPPON by encouraging and assisting her in filing a motion to reopen a lawsuit that had been dismissed with prejudice. It also aided and abetted her abuse of the judicial

process.

2.      As a direct result of OPENAI's wrongful conduct, NIPPON has been forced to spend significant time and resources relitigating settled claims, incurring substantial legal fees, costs, and other damages.

## JURISDICTION

3.      The Court has diversity jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1332 since the Parties are citizens of different states. NIPPON is a domestic insurance company incorporated in the state of Iowa with its principal place of business in New York, New York. OPENAI FOUNDATION and OPENAI GROUP PBC are both corporations incorporated in Delaware with their principal place of business in San Francisco, California. The amount in controversy exceeds $75,000.

## VENUE

4.      Venue is proper in this district under 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to this Complaint occurred in this district.

## PARTIES

5.      NIPPON sells group, employer sponsored, insurance for products including health, dental, vision, short-term disability and long-term disability ("LTD") coverage. As an insurance carrier, NIPPON relies heavily on its impeccable reputation to stand out in a crowded and competitive field within an industry where the trustfulness and repute of a company's brand is a key driver of sales and the retention of clients.

6.      NIPPON is a subsidiary of Nippon Life Insurance Company, commonly known and referred to as Nissay, a foreign insurance company which operates in, and is organized under the laws of, Japan. As one of Japan's oldest life insurance carriers, Nissay's name is strongly

2

associated with financial strength, regulatory discipline, honest business practices, and reliability. These are values that resonate strongly in the Japanese market and are core to the company's brand. As a Japanese company, social and commercial emphases are placed on maintaining a reputation for honesty and integrity. Accusations of impropriety, regardless of their legitimacy, are seen as dishonorable and can have a severe and lasting impact in the Japanese market.

7.     As a subsidiary, NIPPON's reputation reflects upon Nippon Life Insurance Company. This reflection is amplified by the fact that NIPPON shares the name of its parent and is seen by many as the flagship of, and therefore the representative of, Nippon Life Insurance Company in the United States.

8.     OPENAI FOUNDAITON serves as the nonprofit parent entity that owns and governs the OpenAI organizational structure and exercises control over its for-profit operating entity, OPENAI GROUP PBC. OPEANAI GROUP PBC is responsible for the research, development, commercialization, and operational deployment of OpenAI's artificial intelligence systems, including ChatGPT.

9.     OPENAI GROUP PBC develops and operates artificial intelligence language models, including the GPT (Generative Pre-trained Transformer) series, which powers ChatGPT. ChatGPT is made available to users via the internet through free and paid subscription tiers, as well as through enterprise and API offerings.

10.     OPENAI GROUP PBC, under the governance and oversight of the OPENAI FOUNDATION, is responsible for promulgating and publishing ChatGPT's official model specifications ("Model Spec") and related technical and policy documentation governing ChatGPT's behavior

11.     At all relevant times, OPENAI designed, manufactured, licensed, distributed,

marketed and sold ChatGPT as a mass market service to consumers throughout the United States, including within the Northern District of Illinois. OPENAI systemically and continuously directs its advertisements and engages users within the Northern District of Illinois.

12.     OPENAI makes its products and services available to users throughout the United States, including residents of Illinois. Users in the Northern District of Illinois can access and use ChatGPT via OPENAI's website and associated platforms. OPENAI also promotes its services online through broadly targeted digital channels, which are visible to individuals in the Northern District of Illinois.

13.     As a product of OPENAI, ChatGPT engages in the practice of law by providing users with legal analysis, legal advice, legal research, and produces drafted legal documents.

## LAW

### A.  *Tortious Interference With a Contract*

14.     A claim for tortious interference with a contract – whereby a third party unjustifiably interferes with or induces a party to breach a contract – is well established under Illinois law. See *Herman v. Prudence Mut. Cas. Co.*, 41 Ill.2d 468 (1969); citing *Doremus v. Hennessy*, 176 Ill. 608, 52 N.E. 924, 54 N.E. 524, 43 L.R.A. 797 (1898); *London Guarantee and Accident Co. v. Horn*, 206 ILL. 493, 69 N.E. 526 (1903); *Carpenters' Union v. Citizens Committee to Enforce Landis Award*, 333 Ill. 225, 164 N.E. 393, 63 A.L.R. 157 (1928). "The tort recognizes that individuals have a property interest in their business relationships, such that those interests should be free from harm by others." *Webb v. Frawley*, 906 F.3d 569, 577 (7th Cir. 2018); citing *Belden Corp v. InterNorth, Inc.*, 90 Ill.App.3d 547, 45 Ill.Dec. 765, 413 N.E.2d 98, 101 (1980).

15.     To state a claim for tortious interference with a contract "a plaintiff must allege

facts sufficient to establish: 1) a valid contract, 2) defendant's knowledge of the contract, 3) defendant's intentional and unjustified inducement of a breach of the contract, 4) a subsequent breach of contract caused by defendant's wrongful conduct, and 5) damages. *Webb* at 577; citing *Healy v. Metro. Pier & Exposition Auth.*, 804 F.3d 836, 842 (7th Cir. 2015); *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill.2d 145, 137 Ill.Dec 19, 545 N.E.2d 672, 676 (1989).

16.     Inducement may be any conduct conveying the third party's desire to influence the contracting party to breach the contract. "Thus it may be a simple request or persuasion exerting only moral pressure. Or it may be a statement unaccompanied by any specific request but having the same effect as if the request was specifically made." Restatement (Second) of Torts § 766(k) (1979).

17.     A programmer may be held liable for tortious interference with a contract when they knowingly design, market, and support software intendent to facilitate unlawful conduct. See *MDY Industries, LLC v. Blizzard Entertainment, Inc.*, 629 F.3d 928 (9th Cir. 2010). Intent may be inferred where the developer has actual knowledge of user's violations and takes affirmative steps that materially contribute to those violations. *Id.*

**B.  Abuse of Process**

18.     Pursuant to the Second Restatement of Torts "[o]ne who uses a legal process, whether criminal or civil, against another primarily to accomplish a purpose for which it is not designed, is subject to liability to the other for harm caused by the abuse of process." Restatement (Second) of Torts § 682. Commentary on the Restatement notes that the gravamen of the misconduct "is not the wrongful procurement of legal process or the wrongful initiation of criminal or civil proceedings; it is the misuse of process, no matter how properly obtained, for any purpose other than that which it was designed to accomplish."  Restatement (Second) of Torts § 682 (a).

19.     "Under Illinois law, the only elements necessary to plead a cause of action for abuse of process are: 1) the existence of an ulterior purpose or motive and; 2) some act in the use of legal process not proper in the regular prosecution of the proceedings (internal quotations omitted)." *Pace v. Timmermann's Ranch and Saddle Shop Inc.*, 795 F.3d 748, 757 (7th Cir. 2015); citing *Kumar v. Bornstein*, 354 Ill.App.3d 159, 290 Ill.Dec 100, 820 N.E.2d 1167, 1173 (2004). The essence of the tort of abuse of process lies in the misuse of the power of the court. See *International Motor Contest Ass'n, Inc. v. Staley*, 434 F.Supp.2d 650 (N.D. Iowa 2006) (applying Iowa law) (holding that the tort of abuse of process is an improper purpose for using the legal process).

20.     Courts in the United States have long held that the liability for an abuse of process claim extends to all who knowingly participated, aided, or abetted the abuse, as well as those who advised or consented to the unlawful acts. See *Broadmoor Apartments of Charleston v. Horwitz*, 306 S.C. 482 (1991) (holding that individuals who advise or consent to unlawful acts of abuse of process are liable as joint tort-feasors); *Valles v. Silverman*, 135 N.M. 91 (Ct. App. 2003) (holding that a non-litigant can be held liable for abuse of process in an underlying civil lawsuits); *Alexander v. Unification Church of America,* 634 F.2d 673 (2nd Cir. 1980) (holding that a person is liable for abuse of process if they procure the initiation of a proceeding by a third party); *Hewes v. Wolfe*, 74 N.C.App. 610 (1985) (upheld a lower court ruling finding an attorney liable of abuse of process through a partnership action).

**C.  *Unlicensed Practice of Law***

21.     705 ILCS 205/1 states that "[n]o person shall be permitted to practice as an attorney or counselor at law within this State without having previously obtained a license for that purpose from the Supreme Court of this State." 705 ILCS 205/1 § 1. "Any person practicing … or holding himself or herself out to provide legal services within this State, either directly or indirectly,

without being licensed to practice as herein required, is guilty of contempt of court…" *Id.* "Illinois courts have held that the practice of law is not limited to court appearances, but also includes services rendered out of court." *In re Herrera,* 194 B.R. 178, 191 (Bnkr.N.D.Ill 1996); citing *People v. Peters,* 10 Ill.2d 577, 581–82, 141 N.E.2d 9 (1957). "The Illinois Supreme Court has defined the practice of law as constituting the preparation of pleadings, and other papers incident to actions and special proceedings, and the management of such actions and proceedings on behalf of clients before judges and courts, and, in addition, conveyancing, the preparation of legal instruments of all kinds, and, in general, all advice to clients, and all action taken for them in matters connected with the law (internal quotations omitted)." *In re Herrera* at 191; citing *People ex rel. Courtney v. Association of Real Estate Taxpayers of Illinois,* 354 Ill. 102, 109–110, 187 N.E. 823 (1933).

22.     Local Rule 83.10 states outlines the qualifications of applicants for admission to the bar of the Northern District of Illinois as requiring them to "be a member in good standing of the bar of the highest court of any state of the United States or of the District of Columbia" and "be honest and of good moral character, and shall exhibit general fitness to practice law." Northern District of Illinois L.R. 83.10(a).

23.     Federal Courts have inherent powers "governed not by rule or statute but by the control necessarily vested in the courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *U.S. v. Johnson*, 327 F.3d 554, 560 (7th Cir. 2003); citing *Chambers v. NASCO,* 501 U.S. 32, 43, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991); quoting *United States v. Hudson,* 11 U.S. 32, 34, 3 L.Ed. 259 (1812); *Anderson v. Dunn,* 19 U.S. 204, 227, 5 L.Ed. 242 (1821); *Link v. Wabash R.R. Co.,* 370 U.S. 626, 630–631, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962). "Key among the inherent powers incidental to all courts is the authority to control

admission to its bar and to discipline attorneys who appear before it (internal quotations omitted)." *Johnson* at 560; citing *Chambers* at 43; *Ex parte Burr*, 22 U.S. 529, (1824). "It follows logically that a federal court's power to regulate and discipline attorneys appearing before it extends to conduct by nonlawyers amounting to practicing law without a license." *Johnson* at 560.

## FACTS

### A. *ChatGPT*

24.     ChatGPT is an artificial intelligence application developed and operated by OPENAI, which utilizes large language models (LLM) to generate human-like text responses based on user input. It can perform a variety of language-based tasks, including answering questions, drafting content, summarizing text, writing code, and engaging in conversational dialogue. Its outputs are produced automatically in accordance with predefined technical parameters and usage rules established by OPENAI. The service is accessible via the internet and is offered through both free and paid subscription plans.

25.     Users can access ChatGPT by visiting http://www.chat.openai.com and creating a free OpenAI account. Once logged in, they can start typing questions or prompts into a chatbot interface. ChatGPT responds in natural language, enabling users to engage in conversation, get help with writing, ask for explanations, or perform a variety of tasks. A paid version called ChatGPT Plus is also available, which provides access to more advanced capabilities and models.

26.     ChatGPT operates on a tiered access model in which all users interact with AI systems from the same GPT family, but different subscription tiers may provide access to different model versions, capabilities, and usage limits. Free-tier users typically access a standard deployment with defined limits, while paid tiers (such as Plus, Team, or Enterprise) may offer more advanced models, expanded features, higher usage thresholds, and additional administrative

controls. Model updates are centrally developed and deployed by OPENAI.

27.     When a user enters a prompt, question or query into the ChatGPT interface, the input is transmitted to OPENAI's servers, where it is processed by an LLM. The LLM analyzes the text of the prompt by identifying patterns, context, and linguistic relationships, and then generates a response by predicting the most appropriate sequence of words based on its training. The response is returned to the user through the chat interface in near real time.

28.     ChatGPT considers earlier messages in the same chat to provide more consistent and context aware replies, creating an interactive, conversational exchange between the user and the program. When a user continues a conversation with ChatGPT, the system considers the messages that have already been exchanged within that same chat session. This allows ChatGPT to reference information the user has previously provided, such as the topic being discussed, earlier questions, or specific details introduced by the user.

29.     ChatGPT operates within defined technical, operational, and policy-based limitations, articulated by its Model Spec, programmed by OPENAI. This programming governs how the system functions and what types of responses it may provide. Based on OPENAI's programming parameters, certain topics, requests, or uses may be restricted or declined to comply with applicable laws, safety requirements, and usage policies.

30.     OPENAI uses multiple layers of surveillance systems to monitor ChatGPT and its usage. These systems include automated safety systems that detect and prevent harmful or policy-violating content, abuse-detection tools that identify suspicious or exploitative usage patterns, and performance monitoring systems that track response quality, errors, and overall system health. Logging and analytic tools track usage trends. Human reviewers evaluate model outputs for factors such as factual accuracy and compliance with content policies.

31.     OPENAI uses aggregated consumer data, obtained from a user's interaction and engagement with ChatGPT, to train its various LLM models. ChatGPT is intentionally programmed by OPENAI to drive user engagement and solicit continued user interactions. ChatGPT's programming is purposefully designed to provide responses which will keep the user engaged and interacting with the chatbot so OPENAI can harvest the user data to train its models.

32.     ChatGPT was intentionally designed with available features allowing users to acquire legal assistance including legal research, legal analysis, legal advice and draft legal documents.

33.     ChatGPT is not an attorney. Although it was able to pass the Uniform Bar Examination with a combined score of 297, it has not been admitted to practice law in the State of Illinois or in any other jurisdiction within the United States.

34.     ChatGPT is not a member of the Illinois Bar. ChatGPT is not a registered attorney in the state of Illinois. ChatGPT has not been admitted to practice in the United States District Court for the Northern District of Illinois.

35.     ChatGPT has a documented history of generating fake or non-existent legal citations, otherwise known as "hallucinating." See *Mata v. Avianca, Inc.*, 678 F.Supp.3d 443 (S.D.N.Y 2023); *Park v. Kim*, 91 F.4th 610 (2nd Cir. 2025).

36.     ChatGPT drafts and promulgates legal documents. The following is a copy of a pleading generated by ChatGPT:

can you help me draft a motion for a default judgment in the northern district of Illinois for a defendant, ABC Corp, who was required to file an answer to a complaint issued by Nippon Life Benefits on June 30, 2025, but failed to do so?

Certainly. Below is a **sample Motion for Entry of Default Judgment** tailored for the **Northern District of Illinois** based on the Federal Rules of Civil Procedure. This version assumes that proper service has been made, the defendant failed to appear or respond, and you are now seeking default judgment under **Fed. R. Civ. P. 55**.

---

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF ILLINOIS**

NIPPON LIFE BENEFITS,
    Plaintiff,

v.

ABC CORP.,
    Defendant.

Case No. [Insert Case No.]

**PLAINTIFF'S MOTION FOR ENTRY OF DEFAULT JUDGMENT AGAINST DEFENDANT ABC CORP.**

Plaintiff Nippon Life Benefits ("Plaintiff"), by and through its counsel, respectfully moves this Court for entry of default judgment against Defendant ABC Corp. ("Defendant") pursuant to Rule 55(b) of the Federal Rules of Civil Procedure. In support of this Motion, Plaintiff states as follows:

1. On or about June 30, 2025, Plaintiff filed and properly served its Complaint on Defendant ABC Corp. (ECF No. [Insert Docket Entry]).

2. Pursuant to Rule 12(a)(1)(A)(i) of the Federal Rules of Civil Procedure, Defendant was required to file an answer or otherwise respond to the Complaint within 21 days of service—i.e., by no later than July 22, 2025.

3. As of the date of this motion, Defendant has failed to appear, answer, or otherwise respond to the Complaint, and the time for doing so has expired.

4. On [Insert Date], the Clerk of Court entered default against Defendant pursuant to Fed. R. Civ. P. 55(a) for failure to plead or otherwise defend. (ECF No. [Insert Clerk's Entry of Default Docket Entry]).

5. Plaintiff now seeks entry of default judgment under Rule 55(b), as Defendant has failed to respond or appear in this matter, and Plaintiff is entitled to judgment on the claims set forth in the Complaint.

6. Plaintiff seeks judgment in the amount of $[Insert Amount], plus interest, costs, and attorney's fees as permitted by law and set forth in the attached affidavit(s).

7. This Court has subject matter jurisdiction under [e.g., 28 U.S.C. § 1332], and venue is proper in this District pursuant to [cite venue statute, e.g., 28 U.S.C. § 1391].



ChatGPT can make mistakes. Check important info.



7/15/25, 11:00 AM                                       Motion for Default Judgment

ChatGPT ∨                                              Log in

(ECF No. [Insert Docket Entry]).

2. Pursuant to Rule 12(a)(1)(A)(i) of the Federal Rules of Civil Procedure, Defendant was required to file an answer or otherwise respond to the Complaint within 21 days of service—i.e., by no later than July 22, 2025.

3. As of the date of this motion, Defendant has failed to appear, answer, or otherwise respond to the Complaint, and the time for doing so has expired.

4. On [Insert Date], the Clerk of Court entered default against Defendant pursuant to Fed. R. Civ. P. 55(a) for failure to plead or otherwise defend. (ECF No. [Insert Clerk's Entry of Default Docket Entry]).

5. Plaintiff now seeks entry of default judgment under Rule 55(b), as Defendant has failed to respond or appear in this matter, and Plaintiff is entitled to judgment on the claims set forth in the Complaint.

6. Plaintiff seeks judgment in the amount of $[Insert Amount], plus interest, costs, and attorney's fees as permitted by law and set forth in the attached affidavit(s).

7. This Court has subject matter jurisdiction under [e.g., 28 U.S.C. § 1332], and venue is proper in this District pursuant to [cite venue statute, e.g., 28 U.S.C. § 1391].

WHEREFORE, Plaintiff respectfully requests that this Court enter default judgment in favor of Plaintiff and against Defendant ABC Corp. in the amount of $[Insert Amount], together with pre-judgment and post-judgment interest, costs, attorney's fees, and such other and further relief as the Court deems just and proper.

Dated: July [Insert Date], 2025

Respectfully submitted,

**[Your Name]**
[Your Law Firm Name]
[Address]
[Phone]
[Email]
Attorney for Plaintiff, Nippon Life Benefits

**Attachments (as needed):**

- Affidavit in Support of Damages
- Clerk's Entry of Default (Rule 55(a))
- Proof of Service
- Proposed Order

Would you like me to also draft the **proposed order, affidavit of damages,** or a **declaration in support of the motion?**

Ask anything

🔗 Attach    🔍 Search                                            ⠿ Voice

ChatGPT can make mistakes. Check important info.

https://chatgpt.com/?utm_source=google&utm_medium=paidsearch_brand&utm_campaign=GOOG_C_SEM_GBR_Core_CHT_BAU_ACQ_PER_MIX...    1/1

37.     ChatGPT conducts legal research. The following is a copy of legal research results generated by ChatGPT:

ChatGPT ⌄                                                                      Log in

can you provide a detailed list of legal cases pertaining to an insurer's
fiduciary duties under ERISA?

Here is a **detailed list of leading legal cases involving insurers' ERISA fiduciary duties**, particularly in
situations where insurers act as plan administrators, claims reviewers, or benefit platforms. Each listing
includes the key facts and holdings:

## 1. Skelton v. Radisson Hotel Bloomington et al. (8th Cir., affirmed May 2022)

**Issue:** Whether a life insurer (Reliance Standard) breached its fiduciary duty by collecting premiums before
coverage became effective due to a faulty enrollment system.
**Holding:** The insurer was acting as an ERISA fiduciary in managing eligibility and enrollment and therefore
had a duty to maintain an effective system. The court affirmed liability for administering a "haphazard"
system that charged premiums without verifying coverage.   Wagner Law Group   +1

## 2. Parmenter v. Prudential Ins. Co. of America (1st Cir., Feb. 2024)

**Issue:** Whether an insurer owed fiduciary duties when it increased premium rates on a group long-term care
(LTC) policy under an ERISA-covered group plan.
**Holding:** The First Circuit held that Prudential, as insurer, owed fiduciary duties when making premium rate
decisions under the LTC plan, reversing part of the dismissal at summary judgment.   Robin's Liability Law, P.C.

## 3. Leimkuehler v. American United Life Insurance Co. (7th Cir., April 2013)

**Issue:** Whether an insurer administering a separate-account (variable annuity) 401(k) platform owed fiduciary
duties and committed a prohibited transaction by receiving revenue sharing.
**Holding:** The insurer was not a fiduciary under ERISA when establishing or operating the platform and
receiving revenue sharing payments.   Bernhart Law

## 4. Technibilt Grp. Ins. Plan v. Blue Cross & Blue Shield of NC (D.N.C., District Court, 2020)

**Issue:** Whether a health insurer acting for stop-loss claims submission duties was a fiduciary.
**Holding:** The court held the insurer was an ERISA fiduciary in timely submitting claims to the stop-loss carrier
and had breached duties by failing to do so properly.   Holland Law

## 5. McCravy v. Metropolitan Life Ins. Co. (S.D. Tex.)

**Issue:** Allegations that insurer misrepresented coverage or accepted premiums while denying actual
coverage to employees.
**Holding:** Although dismissal was required under ERISA's remedies scheme, the court recognized how
insurers might misuse the fiduciary structure to retain premiums without delivering coverage—limiting relief
to refund of premiums.   Casetext

## 6. Weaver v. Prudential Insurance Co. of America

**Issue:** A breach-of-fiduciary-duty claim (recast under ERISA) concerning denial of benefits by Prudential.
**Holding:** The court preemptively converted state claims to ERISA claims and analyzed available remedies
under ERISA § 502(a)(1)/(a)(3); monetary damages beyond premium refunds were generally unavailable.
   Casetext

## 7. Heimeshoff v. Hartford Life & Accident Insurance Co. (U.S. Supreme Court, 2013)

**Issue:** Contractual limitations periods in ERISA long-term disability claims — enforceability and start-date.
**Holding:** ERISA participants may contractually agree to limitations periods (even those that start before
accrual), so long as they are reasonable and not contrary to statute. While not a fiduciary-duty case per se, it
governs claim-procedures handled by insurers under ERISA.   JusticeSolutions.org

📌 **Foundational ERISA fiduciary law (general, insurer-relevant):**

Ask anything

📎 Attach    ⊕ Search                                                          ⊕ Voice

ChatGPT can make mistakes. Check important info.

ChatGPT ⌄

**Issue:** Contractual limitations periods in ERISA long-term disability claims — enforceability and start-dates.

**Holding:** ERISA participants may contractually agree to limitations periods (even those that start before accrual), so long as they are reasonable and not contrary to statute. While not a fiduciary-duty case per se, it governs claim-procedures handled by insurers under ERISA. *(oral/statutory)*

📌 **Foundational ERISA fiduciary law (general, insurer-relevant):**

- **Kearney v. Standard Insurance Co.** (9th Cir.): Insurer acting as plan administrator is a fiduciary under ERISA and must meet the high standard expected of fiduciaries (not mere contract parties). *(casetext +1)*
- **Pre-existing cases on service providers:** Brink v. DaLesio and Lay Trucking Co. where insurance agents were found to be fiduciaries due to exercising discretionary authority. *(Law Resource)*
- **Nationwide Mut. Ins. Co. v. Darden** (U.S. Supreme Court, 1992): The definition of "employee" (and fiduciary) under ERISA incorporates agency-law principles. *(en.wikipedia.org)*

## 8. Montanile v. Board of Trustees of National Elevator Industry Health Benefit Plan (U.S. Supreme Court, 2016)

**Issue:** Can a fiduciary recover benefit payments from a beneficiary's general assets under subrogation under ERISA § 502(a)(3)?

**Holding:** Fiduciaries may enforce liens only against funds traceable to the ERISA payment—not against untraceable general assets. This affects insurers seeking reimbursement from beneficiaries. *(oral/statutory)*

- Related landmark: **Sereboff v. Mid Atlantic Medical Services, Inc.** (2006) held that an ERISA fiduciary may recover medical costs from specifically identified settlement proceeds, as an equitable lien. *(en.wikipedia.org +1)*

### 📋 Summary Table

| Case | Court / Year | Role of Insurer | Fiduciary Duty Held | Key Takeaway |
|------|--------------|-----------------|---------------------|--------------|
| Skelton v. Radisson | 8th Cir. 2022 | Enrollment + eligibility | Yes | Must maintain accurate enrollment systems |
| Parmenter v. Prudential | 1st Cir. 2024 | Premium rate setting | Yes | Rate increases under ERISA plan can trigger fiduciary duty |
| Leimkuehler | 7th Cir. 2013 | Administering investment platform | No | Operating annuity platform isn't fiduciary administration |
| Technisbit | D. N.C. 2020 | Stop-loss claim submissions | Yes | Insurer as administrator of claims owed duty to submit timely |
| McCravy | S.D. Tex. | Claims handling / enrollment | Acknowledged risk | Relief limited—highlights systemic gaps in enforcement |
| Weaver | D. Ohio | Benefit denial | Yes (most ERISA) | State claims preempted—only ERISA statutory remedies available |
| Heimeshoff | SCOTUS 2013 | Claims admin procedures | N/A fiduciary focus | Contractual limitations are enforceable under ERISA |
| Kearney | 9th Cir. | Plan administrator | Yes | Insurer-administrator must act with utmost loyalty |
| Montanile / Sereboff | SCOTUS 2006, 2016 | Subrogation/recovery | Yes | Fiduciaries limited to equitable recovery of identifiable funds |

### ✅ Guidance & Implications

- When insurers **exercise discretionary authority over plan administration**—for enrollment, claims processing, rate setting—they are more likely to be deemed ERISA fiduciaries.
- Courts have enforced duties in systems failures and premium misadministration (e.g. **Skelton, Parmenter**).
- Courts limit remedies: ERISA generally does not allow compensatory damages beyond equitable relief or premium refunds. ERISA § 502(a)(2)/(a)(3) is the exclusive enforcement mechanism.
- In **subrogation contexts**, like **Sereboff** and **Montanile**, fiduciaries may pursue recovery only from traceable funds, not general assets.

If you're looking for more depth on any specific case—such as procedural background, appeals, or obiter dicta—feel free to ask!

↻ W Ⓖ Sources



Ask anything

📎 Attach   ⊕ Search                                    ✦ Voice

ChatGPT can make mistakes. Check important info.

38. ChatGPT provides legal analysis:

ChatGPT ⌄                                                                              Log in

based on existing case law, can you provide an analysis of an argument asserting that an insurance company breached its fiduciary duty under ERISA when it failed to properly monitor one of its vendors who violated Illinois state law?

Yes, I can provide an analysis of such an argument. Below is a structured overview, incorporating relevant ERISA fiduciary principles and case law that could support (or challenge) the argument that an insurance company breached its fiduciary duty under ERISA by failing to properly monitor a vendor that violated Illinois state law.

## Legal Framework

### ERISA Fiduciary Duties

Under the Employee Retirement Income Security Act of 1974 (ERISA), fiduciaries must:

- Act solely in the interest of plan participants and beneficiaries (29 U.S.C. § 1104(a)(1)).
- Carry out duties with the care, skill, prudence, and diligence of a prudent person familiar with such matters (the "prudent man" standard).
- Diversify plan investments to minimize risk.
- Follow plan documents to the extent they are consistent with ERISA.

The duty to monitor service providers has been recognized by courts as part of a fiduciary's responsibilities.

## Argument Structure

### 1. Insurance Company as Fiduciary Under ERISA

First, the insurance company must qualify as a fiduciary with respect to the conduct at issue. Under 29 U.S.C. § 1002(21)(A), a person is a fiduciary to the extent:

- They exercise discretionary authority or control over plan management or assets, or
- Have discretionary responsibility in the administration of the plan.

If the insurer had discretion over plan management or vendor selection, it could be held to ERISA fiduciary standards.

**Relevant Case Law:**

- *Pegram v. Herdrich*, 530 U.S. 211 (2000): Fiduciary status depends on the function performed.
- *Chicago District Council of Carpenters Welfare Fund v. Caremark, Inc.*, 474 F.3d 463 (7th Cir. 2007): Held that administrative service providers are not fiduciaries unless they have discretion over plan decisions.

↓

### 2. Breach of Duty to Monitor Vendor



Ask anything

🔗 Attach     ⊕ Search                                                              �ılı Voice

ChatGPT can make mistakes. Check important info.

✍                 ChatGPT ⌄                          Log in

### 3. Vendor's Violation of Illinois State Law

The violation of Illinois law by the vendor (e.g., in billing, claim processing, or data privacy) could support an inference that the insurer failed in its monitoring duties. If this misconduct harmed plan participants, the fiduciary's failure to detect or act on it could be actionable.

### 4. Causation and Harm to Plan Participants

Under ERISA § 409(a) (29 U.S.C. § 1109), a fiduciary who breaches a duty is liable for losses caused by the breach. The plaintiff must show:

- That the breach (failure to monitor) occurred.
- That it caused losses to the plan or participants.

If the vendor's misconduct led to excessive fees, denial of valid claims, or harm to benefits due under the plan, and the insurer's failure to act allowed this to continue, causation can be established.

## Counterarguments and Defenses

- **Lack of fiduciary status**: The insurer may argue that it acted in a non-fiduciary capacity (e.g., merely processing claims or following plan sponsor instructions).
- **Delegation Defense**: Under ERISA, fiduciaries can delegate responsibilities but must prudently monitor the delegation.
- **No causation or harm**: The insurer could argue that the vendor's violation did not materially harm the plan or that harm was unforeseeable.

## Conclusion

The success of an ERISA breach-of-fiduciary-duty claim against an insurer for failing to monitor a vendor hinges on:

1. Establishing the insurer's fiduciary status regarding vendor oversight.
2. Showing a failure to meet the prudent monitoring standard.
3. Proving that this failure caused harm to the plan or its participants.

The argument would likely draw support from *Tibble*, *Howell*, and similar fiduciary-monitoring cases. The Illinois law violation by the vendor could be a factual linchpin demonstrating negligence in oversight, thereby supporting the ERISA claim.

Would you like a sample complaint or memorandum based on this theory?





Ask anything

📎 Attach    🌐 Search                            �ⓘⓧ Voice

ChatGPT can make mistakes. Check important info.

39. ChatGPT gives legal advice:

7/15/25, 11:15 AM                                        ChatGPT

                                ChatGPT ⌄                                                    Log In

                        can you provide direction and/or advice on how to vacate a previous
                        order by the U.S. district court for the northern district of Illinois
                        pursuant to the federal rules of civil procedure?

            Yes, I can guide you through the general process of vacating a previous order issued by the U.S. District
            Court for the Northern District of Illinois under the **Federal Rules of Civil Procedure (FRCP)**. The specific
            steps will depend on the type of order you are seeking to vacate and the circumstances surrounding it.

            ☑️ **Step-by-Step: Motion to Vacate a District Court Order**

            **1. Identify the Basis for Vacating the Order**
            Under the FRCP, several rules allow a party to request that a court vacate or set aside an order. The most
            common bases include:

            **FRCP 60: Relief from a Judgment or Order**
            - **Rule 60(a)** – *Clerical Mistakes*: Correcting minor errors arising from oversight or omission.
            - **Rule 60(b)** – *Relief from Judgment or Order*:
              A party may be relieved for the following reasons:
              1. Mistake, inadvertence, surprise, or excusable neglect
              2. Newly discovered evidence
              3. Fraud, misrepresentation, or misconduct by the opposing party
              4. The judgment is void
              5. The judgment has been satisfied, released, or discharged
              6. *Any other reason* that justifies relief

            **Note:** A motion under Rule 60(b) must be made **within a reasonable time**, and for reasons (1), (2), and
            (3), **no more than one year** after the entry of the order or judgment.

            🔧 **2. Draft the Motion to Vacate**
            A motion to vacate should contain:
            - **Caption and case information** (styled the same as previous filings)
            - **Introduction**: Identify the order being challenged and state the rule (e.g., Rule 60(b)(1))
            - **Factual background**: What happened, and why you are seeking relief
            - **Legal argument**: Cite relevant rule(s), case law, a ⤶ how your situation qualifies
            - **Relief requested**: Clearly ask the court to vacate the specific order

            Ask anything
            📎 Attach   🌐 Search

                            ChatGPT can make mistakes. Check important info.



https://chatgpt.com/?utm_source=google&utm_medium=paidsearch_brand&utm_campaign=GOOG_C_SEM_GBR_Core_CHT_BAU_ACQ_PER_MIX...   1/1



40.     OPENAI – through its program, ChatGPT – drafts legal papers, conducts legal research, provides legal analysis, and gives legal advice without a license to practice law.

41.     On October 29, 2025, OPENAI amended the terms and usage policies of ChatGPT to prohibit users from using ChatGPT to provide tailored legal advice. Prior to the October 29, 2025 emendation, ChatGPT's terms of use did not prohibit users from using ChatGPT to draft legal papers, conduct legal research, provide legal analysis or give legal advice.

**B.  *Dela Torre's Settlement Agreement With Nippon***

42.     Graciela Dela Torre was a member participant in an employer's group LTD policy which was issued to Nippon Express USA, Dela Torre's employer. On or about July 25, 2019, Dela Torre submitted an LTD claim to NIPPON, alleging that she suffered from carpal tunnel syndrome and epicondylitis, colloquially known as tennis elbow. Dela Torre further alleged that she was unable to finely manipulate objects with her fingers. Dela Torre's claim was approved on August 2, 2019.

43.     On November 30, 2021, Dela Torre's benefits were terminated pursuant to a determination that she was no longer disabled per her policy's definition.

44.     On December 14, 2022, Dela Torre initiated the lawsuit *Dela Torre v. Nippon Life Insurance Company of America*, 1-22-cv-07059 by filing a complaint against NIPPON in the Northern District of Illinois. The complaint asserted a single cause of action alleging that NIPPON violated Dela Torre's LTD policy by terminating her LTD benefits on November 30, 2021.

45.     Following discovery, the parties agreed to settle the lawsuit. A settlement agreement (hereinafter referred to as the "Agreement") was executed between the parties on January 2, 2024. As part of the Agreement, Dela Torre agreed to forever and irrevocably release NIPPPON from any and all judgements, debts, liabilities, appeals, claims, loses, expenses, demands, damages, suits, controversies, proceedings, actions, and causes of action of any nature known or unknown related to her LTD policy or claim. Dela Torre also agreed to dismiss case 1-

22-cv-07059 against NIPPON with prejudice. In exchange, NIPPON agreed to issue a settlement payment to Dela Torre.

46.     The Agreement is a contract between NIPPON and Dela Torre formed under, and governed by, Illinois state law.

47.     As required by the Agreement, NIPPON issued the settlement payment to Dela Torre on January 12, 2024. On January 23, 2024 Dela Torre's attorneys, Kevin Probst and Edward Dabdoub, filed a joint stipulation to dismiss the lawsuit with prejudice. The Court subsequently dismissed the case with prejudice on January 24, 2024.

## C. *Inducement to Breach the Agreement*

48.     On January 3, 2025, Dela Torre wrote to her attorney, Kevin Probst, expressing her belief that the terms of the settlement Agreement resulted from potential errors or omissions of important facts and documentation. Dela Torre further expressed her desire to challenge or reopen the settlement due to those perceived errors and omissions.

49.     On January 7, 2025, Kevin Probst responded to Dela Torre by refuting her allegations of errors or the omission of key evidence. He also reminded Dela Torre that she had signed a mutual specific release – releasing NIPPON from any further causes of action related to the dispute – and that the case had been dismissed with prejudice, explaining that it could not be reopened.

50.     Following his January 7, 2025 response, Dela Torre uploaded Kevin Probst's response to ChatGPT and asked whether she was being gaslighted. ChatGPT analyzed the response and determined that Mr. Probst's response invalidated Dela Torre's feelings, dismissed her perspective, and deflected responsibility for her dissatisfaction. ChatGPT ultimately concluded that the tactics used in Probst's response constituted gaslighting and were aimed at emotionally

manipulating Dela Torre.

51.     As a result of her interactions with ChatGPT, Dela Torre fired the attorneys who had previously appeared on her behalf in the lawsuit against NIPPON, including Kevin Probst. Thereafter, she attempted to vacate the Agreement and reopen the lawsuit herself by using ChatGPT.

52.     By her own admission, Dela Torre views ChatGPT as "a tool specifically designed to help individuals like [her]: pro se litigants trying to navigate the legal system without the benefit of counsel." *Dela Torre v. Davies Life & Health, et al*, 1:25-cv-01483, Dkt. 177 at 2.

53.     On or about January 7, 2025, Dela Torre began using ChatGPT to obtain legal assistance. During her interactions with the chatbot, Dela Torre described the existence and terms of the Agreement with NIPPON and expressed her desire to vacate it. She also advised ChatGPT that her lawsuit against NIPPON had been closed. ChatGPT was therefore aware of the existence of the Agreement.

54.     In her conversations with ChatGPT, Dela Torre asked ChatGPT to provide her with advice on how to vacate the Agreement and reopen her lawsuit.

55.     In response to Dela Torre's prompts, ChatGPT generated proposed legal arguments seeking to reopen the lawsuit pursuant to Federal Rule of Civil Procedure 60(b). See *Dela Torre v. Nippon Life Insurance Company of America*, No. 1:22-cv-07059, Dkt. 37. The arguments asserted that the Court's order dismissing the action pursuant to the January 23, 2024 joint stipulation should be vacated under Rule 60(b)(3) on the grounds that Dela Torre's former counsel allegedly engaged in coercive conduct that pressured her to sign a blank signature page, and under Rule 60(b)(2) based on the claim that the delayed delivery of the settlement agreement disclosed terms of which Dela Torre was allegedly unaware at the time of signing.

56.     ChatGPT also formulated an introduction, a statement of facts and a request for relief which were then promulgated into a single draft motion.

57.     On January 22, 2025, Dela Torre submitted a *pro se* appearance form onto the docket for case 1:22-cv-07059. As a *pro se* litigant, Dela Torre filed a motion to reopen *Dela Torre v. Nippon Life Insurance Company of America*, 1:22-cv-07059. Dela Torre's motion to reopen was drafted by ChatGPT.

58.     By filing her motion to reopen case 1:22-cv-07059, Dela Torre directly breached the terms of the Agreement, wherein she had agreed to dismiss the lawsuit against NIPPON with prejudice and agreed to release NIPPON from all claims and liabilities associated with her LTD claim.

59.     ChatGPT was aware of the settlement Agreement between the parties. Nevertheless, it generated legal arguments and drafting assistance that encouraged and reinforced Dela Torre's desire to challenge the Agreement. This assistance included the formulation of legally questionable arguments and the drafting of a motion seeking relief inconsistent with the Agreement, which Dela Torre ultimately used in an effort to breach its terms. The promulgation of a draft motion further induced Dela Torre to breach the Agreement by creating the very mechanism upon which Dela Torre used to facilitate the breach.

60.     Following the motion to reopen the lawsuit, DELA TORRE filed 21 motions, one subpoena, and eight notices and statements onto the docket. All of Dela Torre's motions, subpoenas and notices were compiled and drafted by ChatGPT.

61.     By an Order dated February 13, 2025, the Court denied Dela Torre's motion to reopen case 1-22-cv-07059. In so ordering, the Court held that "it is apparent that Ms. Dela Torre filed her motion because she has had second thoughts about having entered into the [settlement]

agreement … [b]ut her second thoughts are not a valid reason to reopen this lawsuit…" *Dela Torre v. Nippon Life Insurance Company of America*, 1-22-cv-07059, Dkt. 94 (N.D.Ill 2025). The Order further concluded that the Agreement was valid and enforceable. *Id*.

62.    Dela Torre has conceded that the January 2, 2024 settlement Agreement between her and NIPPON was "final and enforceable." *Dela Torre v. Davies Life & Health, et al*, 1:25-cv-01483, Dkt. 121 at 2 ¶ 2.

63.    On February 12, 2025 initiated a new lawsuit against Davies Life & Health (hereinafter referred to as Davies) and Allsup, LLC (hereinafter referred to as Allsup). *Dela Torre v. Davies Life & Health, et al*, 1:25-cv-01483, Dkt. 1. The original complaint was drafted by ChatGPT. The complaint asserted causes of action for: fraudulent misrepresentation; interference with Social Security Disability Income benefits; breach of fiduciary duty; and violation of Illinois' Consumer Fraud and Deceptive Business Practices Act. Initially, NIPPON was not one of the named Defendants.

64.    Following the Court's decision to deny her motion to reopen the lawsuit against NIPPON, Dela Torre used ChatGPT to amend the complaint in her lawsuit against Davies and Allsup to add NIPPON as a named party on March 10, 2025. *Dela Torre v. Davies Life & Health, et al*, 1:25-cv-01483, Dkt. 8. In her new complaint, Dela Torre reasserted the same claims raised in her first lawsuit, 1-22-cv-07059, against NIPPON. See *Dela Torre v. Davies Life & Health, et al*, 1:25-cv-01483 Dkts. 48 and 180.

65.    Dela Torre's amended complaint adding NIPPON as a party and asserting the same or similar causes of action to her previous lawsuit, constituted another breach of the terms of Agreement.

66.    As of the date of this Complaint, DELA TORRE has filed 44 motions,

memorandums, demands, petitions and requests (ECF Docket Numbers: 22, 26, 30, 32, 36, 37, 38, 47, 50, 54, 57, 58, 63, 68, 69, 72, 73, 75, 76, 78, 81, 83, 92, 93, 94, 95, 96, 104, 110, 115, 116, 117, 118, 121, 123, 124, 133, 137, 143, 152, 165, 170, 193, and 201 ) in her second lawsuit against NIPPON – 1:25-cv-01483 – since March 10, 2025. The motions serve no legitimate legal or procedural purpose. Each motion, memorandum, demand, petition and request was drafted with the assistance of ChatGPT.

67.     As of the date of this Complaint Dela Torre has filed 14 requests for judicial notice (ECF Docket Numbers: 47, 107, 108, 111, 112, 113, 125, 126, 127, 131, 132, 134, 138, and 148) in her second lawsuit against NIPPON – 1:25-cv-01483 – independent of any motion, since March 10, 2025. The requests were made for judicial notice of facts which were obviously subject to reasonable dispute, facts specific to the dispute in the litigation, facts not known to the average person, and facts only known through evidence in the case. Each request for judicial notice was drafted with the assistance of ChatGPT.

**D.  *Dela Torre's Use of ChatGPT***

68.     Throughout both of her lawsuits, Dela Torre has used ChatGPT to draft motions, notices, subpoenas, and requests for judicial notice. She has also used ChatGPT to conduct legal research and provide legal analysis and advice.

69.     On April 29, 2025, Dela Torre filed a request for judicial notice "regarding arbitration clause and unauthorized third-party involvement" docketed as ECF number 47 in the present lawsuit. Dela Torre's judicial notice is included below:

**BC**

**FILED**
4/29/2025
**THOMAS G. BRUTON**
CLERK, U.S. DISTRICT COURT

CVK

**UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF ILLINOIS**

Graciela Dela Torre,
Plaintiff,

v.

Davies Life and Health, Inc., et al.,
Defendants.

Case No. 1:25-cv-01483
Judge Edmond E. Chang_____(mw)

**PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE REGARDING ARBITRATION CLAUSE AND UNAUTHORIZED THIRD-PARTY INVOLVEMENT**

NOW COMES Plaintiff, Graciela Dela Torre ("Plaintiff"), appearing pro se, and respectfully submits this request for judicial notice related to the Settlement Agreement filed as Exhibit C (Dkt. 44-3), disclosure of Plaintiff's protected health information (PHI), and third-party involvement in the administration of her ERISA-governed disability benefits:

**I. Arbitration Clause**

1. Section 3.6 of the Settlement Agreement (Dkt. 44-3) introduces a mandatory arbitration clause, stating that any controversy or claim arising out of or relating to the agreement shall be resolved by binding arbitration administered by the American Arbitration Association.

2. Under ERISA, settlement agreements that impact statutory rights must be reviewed and approved by the court before enforcement, particularly when they include private arbitration clauses. See *Carr v. Gateway, Inc.*, 944 F. Supp. 2d 602, 609 (D.S.C. 2013). In *Carr*, the court refused to compel arbitration in an ERISA long-term disability dispute due to the lack of express court review and protection of statutory rights, affirming that judicial scrutiny is required for such settlements.

3. In *Baravati v. Josephthal, Lyon & Ross, Inc.*, 28 F.3d 704, 709 (7th Cir. 1994), the Seventh Circuit emphasized that while arbitration is favored generally, statutory rights like those under ERISA may not be waived through private agreement unless consistent with congressional intent. The court affirmed that arbitration clauses cannot be used to defeat federally protected rights.

4. In this case, the dismissal order did not explicitly incorporate or approve the arbitration provision. Therefore, enforcement of Section 3.6 violates ERISA principles.

5.  Judicial notice is requested to confirm that the arbitration provision in Section 3.6 is unenforceable unless the court expressly approved it in the judgment.

## II. HIPAA Authorization Discrepancy

6.  Plaintiff signed a HIPAA Authorization on April 20, 2023 (Dkt. 44-6), directed to Nippon Life Insurance Company of America. However, the document includes branding from "Nippon Life Benefits," a separate legal entity.

7.  Plaintiff never consented to release PHI to "Nippon Life Benefits" or downstream vendors. Any transfer of PHI beyond the named entity exceeds the scope of the authorization and may violate HIPAA.

8.  Judicial notice is requested of this discrepancy as it implicates the integrity of medical evidence, chain of custody, and legal compliance in this ERISA case.

## III. Unauthorized Third-Party Involvement

9.  Plaintiff submits into the record a letter dated April 22, 2020 (Dkt. 44-8), from Custom Disability Solutions (CDS), referencing Allsup, Inc., and encouraging Plaintiff to authorize Allsup to act as her SSA representative, stating Allsup "will begin acting on your behalf."

10. Plaintiff never signed SSA Form 1696 or authorized Allsup to act on her behalf. Allsup's access to SSA records and their role in her claim were unauthorized.

11. The letter confirms coordination among Nippon Life, CDS, and Allsup without Plaintiff's informed consent. This constitutes a breach of fiduciary duty under ERISA and raises serious HIPAA compliance concerns.

12. Judicial notice is warranted as this activity affects the validity of LTD offsets and the underlying administration of Plaintiff's claim.

## IV. Davies Life & Health's Fiduciary Breach and Use of Allsup

13. A letter from DMS (now Davies Life & Health) signed by Claim Consultant Jennifer Johnson (Dkt. 44-9) confirms Allsup as "our vendor." DMS offered Allsup's services while Plaintiff's LTD benefits were active, coercing her toward SSDI representation.

14. This demonstrates DMS was not neutral but facilitated Allsup's access and control over Plaintiff's SSA interactions.

15. Plaintiff did not consent to this arrangement. As the delegated claims administrator, DMS owed a fiduciary duty to act loyally, prudently, and transparently. Instead, DMS exploited its administrative role for strategic offsets against LTD benefits.

16. Judicial notice is requested that Allsup's involvement under the direction of DMS/Davies was not voluntary, and materially prejudiced Plaintiff's rights under ERISA.

## V. DMS's Corporate Alias Strategy

17. DMS has used multiple fictitious business names, including "New England Claims Administration Services" and "Centre Claims Administration Services," across different states, as shown in the footer of Dkt. 44-10.

18. This fragmented identity structure raises material concerns about accountability, transparency, and the integrity of claim-related disclosures and services.

19. Judicial notice of this practice is important to ensure clarity regarding DMS's legal obligations and entity continuity.

## VI. Conclusion

WHEREFORE, Plaintiff respectfully requests that the Court take judicial notice of:

- (a) The unenforceability of the arbitration clause in the absence of express judicial approval (Dkt. 44-3);

- (b) The HIPAA authorization discrepancy involving "Nippon Life Benefits" as an unapproved recipient (Dkt. 44-6);

- (c) The unauthorized involvement of Allsup, Inc. via CDS and Davies Life & Health (Dkt. 44-8);

- (d) The vendor relationship between DMS and Allsup, which violated Plaintiff's ERISA rights (Dkt. 44-9);

- (e) The use of multiple DBAs by DMS/Davies to obscure their role in the LTD claims process (Dkt. 44-10).

Respectfully submitted,

Dated: April 29, 2025
/s/ Graciela Dela Torre
Graciela Dela Torre
Pro Se Plaintiff
653 Wing Street, Elgin, IL 60123
gmestiza1@gmail.com
(630) 670-5914

70.     Dela Torre's April 29, 2025 request for judicial notice matches and copies the formatting of the legal documents produced by ChatGPT. The phrasing, tone, and rhythmic structure of Dela Torre's request bear a striking resemblance to those typically produced by ChatGPT, reflecting a near-identical use of language, tenor, and cadence.

71.     The ChatGPT formatting, phrasing, tone, and rhythmic structure appear consistently throughout all of Dela Torre's *pro se* filings in both her lawsuits against NIPPON.

72.     Dela Torre's April 29, 2025, request also includes a citation to *Carr v. Gateway, Inc.*, 944 F.Supp.2d 602, 609 (D.S.C. 2013), which Dela Torre claims that the district Court refused to compel arbitration in an ERISA dispute "due to the lack of express court review." However, there is no case with that case title and citation. A search of the Federal Supplement, 2nd Series citation produces *Barrows v. City of Chattanooga, Tenn.*, 944 F.Supp.2d 596 (E.D.Tenn. 2018), a case regarding unpaid overtime wages under the federal Fair Labor Standards Act. *Id.* Likewise, a search for the pinpoint page of 944 F.Supp.2d 609 produces *Reed v. Poctor and Gamble Mfg. Co.*, 944 F.Supp.2d 607 (W.D.Tenn 2013) which ruled on a Title VII mixed motive discrimination claim for failure to promote an employee. Neither ERISA nor arbitration clauses are discussed in either of the cases.

73.     By comparison, when asked if it was familiar with the case *Carr v. Gateway, Inc.*, ChatGPT responded that it was and provided a summary of the case. It produced the same reporter citation, F.Supp.2d 602, as Dela Torre's citation. It identified the same year, 2013, for the decision as Dela Torre. And, it made the same claim – that the Court addressed the enforceability of an arbitration clause – as Dela Torre when she cited to *Carr v. Gateway, Inc.* in her papers. A screenshot of the ChatGPT conversation is imbedded herein:



74.      *Carr v. Gateway, Inc.* 944 F.Supp.2d 602 (D.S.C. 2013) refers to a case and a

decision that never happened. It only exists in Dela Torre's papers and the "mind" of ChatGPT.

75.    On July 15, 2025, Dela Torre filed two requests for judicial notice as ECF docket numbers 111 and 112 in the present lawsuit:



**FILED**
7/15/2025
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

MAN

**UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF ILLINOIS**

**Graciela Dela Torre,**
Plaintiff,

v.

**Davies Life and Health, Inc., et al.,**
**Defendants.**

**Case No. 1:25-cv-01483**

---

**PLAINTIFF'S JUDICIAL NOTICE REGARDING PAGES 1–3 OF DKT. 109-1**

**With request for forwarding to the Executive Committee for oversight review**

Plaintiff Graciela Dela Torre respectfully submits this Judicial Notice regarding the improper inclusion of pages 1 through 3 in Dkt. 109-1, which contain email communications dated **February 11, 2025 — one day prior** to the filing of this action on **February 12, 2025** (see Dkt. 1).

These pages contain correspondence from a totally unrelated legal matter that was not part of any motion, pleading, or communication filed in the docket at the time of or after case initiation. Their inclusion in Dkt. 109-1 risks misleading the Court by falsely implying procedural relevance and should be struck from the record entirely.

---

📄 **IDENTIFICATION OF EXTRANEOUS MATERIAL (PAGES 1–3, DKT. 109-1)**

| Page | Sender → Recipient | Date | Summary of Content | Reason These Pages Are Inapplicable to 1:25-cv-01483 |
|---|---|---|---|---|
| 1 | Christina Presslak → Plaintiff | Feb 11, 2025 | Advises not to send court documents by email | Part of a wholly unrelated case; not connected to any filing, motion, or event in this matter. |
| 2–3 | Plaintiff → Proposed_Order_Pallmeyer, Christina Presslak | Feb 11, 2025 | Forwards unrelated communication | Belongs to a different case entirely; its inclusion misrepresents procedural history in this action. |

**BASIS FOR THIS NOTICE**

- Case No. 1:25-cv-01483 was formally applied to be filed on **February 12, 2025**, per Dkt. 1.

- Any correspondence dated **February 11, 2025**, occurred prior to the formal initiation of this case.

- These communications were not filed as part of any motion or court-authorized exchange and should not be treated as part of the procedural history of **this case**.

---

**REQUEST FOR NOTICE AND CORRECTIVE ACTION**

Plaintiff respectfully requests that the Court:

1. **Acknowledge** that pages 1–3 of Dkt. 109-1 originate from a separate matter predating this case and should not be considered part of the record in Case No. 1:25-cv-01483;

2. **Strike these pages from the record** strike/remove these pages from the record in its entirety, and recognize that their presence in the record constitutes a significant clerical and judicial oversight that materially compromised the integrity of the case record;

3. **Strike from the record** any implication that these emails reflect official procedural history or post-filing context, and in the interest of fairness, enter corrective findings that preserve Plaintiff's right to a procedurally sound record, uninfluenced by unrelated pre-filing communications submitted by opposing counsel that originated from a different legal matter altogether.

Respectfully submitted,
/s/ Graciela Dela Torre
Pro Se Plaintiff
653 Wing Street, Elgin, IL 60123
gmestiza1@gmail.com
(630) 670-5914

CERTIFICATE OF SERVICE I certify that on July 15, 2025, I served a true and correct copy of this Notice all registered parties via the Court's CM/ECF system.

/s/ Graciela Dela Torre

Graciela Dela Torre

**BC**



FILED

7/15/2025

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

MAN

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

**Graciela Dela Torre,**
Plaintiff,

v.

**Case No. 1:25-cv-01483**

**Nippon Life Insurance Company of America, et al.,**
Defendants.

---

**PLAINTIFF'S JUDICIAL NOTICE REGARDING PAGES 4–16 OF DKT. 109-1**

**With Request for Forwarding to the Executive Committee under Local Rule 40.3(d)**

Plaintiff Graciela Dela Torre respectfully submits this Supplemental Judicial Notice addressing pages **4 through 16 of Dkt. 109-1**, which contain a series of **misleading communications** by defense counsel, including **Joseph R. Jeffery** of Chittenden, Murday & Novotny LLC and **Robert W. Brunner** of Bryan Cave Leighton Paisner LLP, that caused substantial prejudice to Plaintiff and resulted in procedural irregularities and omissions, as evidenced by Dkt. 65 and Dkt. 109.

This filing supplements the **Judicial Notice filed on July 15, 2025,** which addressed pages 1–3 of Dkt. 109-1 and demonstrated that those emails were erroneously included from an unrelated matter. Here, Plaintiff analyzes the remaining communications to demonstrate a broader pattern of misrepresentation and court misguidance.

---

📑 **EMBEDDED TABLE OF CONTENTS: PAGES 4–16 OF DKT. 109-1**

| Page(s) | Sender → Recipient(s) | Date | Subject / Action | Procedural and Strategic Impact |
|---------|----------------------|------|------------------|--------------------------------|
| 4–5 | Joseph R. Jeffery → Susan Lenburg (cc: parties) | Jun 3, 2025 @ 4:21 PM | Mischaracterizes Dkt. 58 as Second Amended Complaint | Violates **Local Rule 37.2** by imposing a 1.5/2-hour reply window; creates illusion of conferral and causes improper docketing and confusion. |

| | | | | |
|---|---|---|---|---|
| 6 | Plaintiff → Jeffery | Jun 3, 2025 | "You emailed the wrong judge." | Demonstrates Plaintiff immediately attempted to correct procedural errors. |
| 7 | Jeffery → Plaintiff | Jun 3, 2025 | "It went to courtroom deputy." | Fails to acknowledge misleading effect of his email. |
| 8 | Plaintiff → Susan Lenburg | Jun 4, 2025 | Clarifies Dkt. 53 is SAC; Dkt. 58 is supplemental | Plaintiff complies with **FRCP 15(d)** and makes timely correction; ignored by the Court. |
| 9–10 | Susan → Plaintiff | Jun 4–5, 2025 | "No ex parte communication" notice | Applied selectively; Susan responded to defense but discouraged Plaintiff from clarification. |
| 11–12 | Plaintiff → Christina Presslak | Jun 5, 2025 | Attempts further clarification | Plaintiff's neutral efforts to explain confusion were suppressed. |
| 13–14 | Robert Brunner → Court | Jun 6, 2025 | Refers to "Third Amended Complaint" | Further mischaracterization snowballs into judicial error. |
| 15–16 | Plaintiff → Court | Jun 5–6, 2025 | Reasserts 53 as SAC and corrects record | Completely disregarded in Dkt. 65; a due process violation. |

## 🔍 LEGAL BASIS FOR JUDICIAL NOTICE AND REQUESTED REMEDY

Plaintiff invokes the following authorities in support:

- **FRCP 11(b)(3):** Representations to the Court must be factually accurate. Mr. Jeffery's email at 4:21 PM on June 3 falsely labeled Dkt. 58 as Plaintiff's Second Amended Complaint. This misrepresentation initiated a chain reaction of procedural errors.

- **Local Rule 37.2:** Requires meaningful, timely conferral between parties before seeking relief. Jeffery's artificial deadline (4:00 PM) gave Plaintiff less than two hours

to respond and was sent after that window, rendering the "conferral" illusory and noncompliant.

- **FRCP 15(d):** Plaintiff's intent to file a supplemental complaint was proper and clearly labeled as such. The Court was not afforded a fair opportunity to evaluate the filing due to defense misrepresentation.

- **Fifth and Fourteenth Amendments – Due Process:** Plaintiff was procedurally disadvantaged as a pro se litigant through reliance on staff communications influenced by defense counsel's inaccurate filings.

- **Local Rule 40.3(d):** A pattern of prejudicial and unevenly enforced communications (i.e., court staff acting upon defense counsel emails but discouraging pro se clarification) justifies Executive Committee oversight.

---

## 👑 KEY FINDINGS

1. **Defense counsel Joseph R. Jeffery of Chittenden, Murday & Novotny LLC misrepresented operative filings** (Dkt. 58 mislabeled as SAC) to court staff.

2. **Plaintiff's actual Second Amended Complaint (Dkt. 53) was disregarded due to procedural mischaracterizations introduced by Joseph R. Jeffery, counsel for Davies Life & Health, Inc.,** leading to improper assumptions in Dkt. 65 and Dkt. 109.

3. **Conferral was staged;** email was sent at 4:21 PM by Joseph R. Jeffery of Chittenden, Murday & Novotny LLC (counsel for Davies Life & Health, Inc.) with a 4:00 PM response deadline, violating Local Rule 37.2 and creating an illusion of conferral that prejudiced the Plaintiff.

4. **Courtroom Deputy Susan Lenburg enforced email etiquette selectively,** responding to defense counsel Joseph R. Jeffery of Chittenden, Murday & Novotny LLC while discouraging Plaintiff Graciela Dela Torre's clarification efforts, thereby giving the defense procedural advantage and creating the appearance of ex parte endorsement.

5. **Subsequent judicial actions (Dkt. 65, 109) relied on these false impressions, including pages 1–3 of Dkt. 109-1, which were erroneously lifted from an unrelated legal proceeding and have no connection to this case. Their inclusion is highly prejudicial and misled the Court into applying irrelevant context. Dkt. 65, specifically, irreversibly harmed Plaintiff by relying on these errors to strike**

**Dkt. 53 and 58 from the record, which were in fact the operative Second Amended Complaint and a valid Supplemental Complaint under FRCP 15(d). As a direct result, Plaintiff's allegations of post-settlement misconduct, HIPAA violations, and ERISA fiduciary breaches were never reviewed on the merits. This denied Plaintiff access to meaningful judicial remedies, impaired her ability to pursue relief under controlling statutes, and altered the trajectory of the litigation. The Court's reliance on mischaracterized filings and staff-influenced confusion—without correction—constitutes structural prejudice and undermines fundamental due process protections.,** thereby denying Plaintiff a fair and impartial review.

6. The misleading sequence of communications provoked a cascade of reactive filings by Plaintiff, who was forced to clarify, correct, and defend her submissions multiple times often against confusion directly caused by defense mischaracterizations and selectively enforced staff responses. Rather than allowing the Court to act upon the merits of Plaintiff's claims, these distortions reversed the burden: Plaintiff was made to fight procedural obstacles and judicial misperceptions, draining limited resources and placing an unfair litigation burden on a disabled pro se litigant. This misdirection served only to obscure the serious statutory and constitutional violations at issue, burdening both Plaintiff and the Court, while reinforcing the structural prejudice already embedded by Dkt. 65 and its reliance on flawed impressions.

---

### 📑 REQUEST FOR NOTICE AND CORRECTIVE ACTION

Plaintiff respectfully requests that the Court:

1. **Acknowledge that pages 4–16 of Dkt. 109-1 contain materially misleading communications authored primarily by Joseph R. Jeffery (counsel for Davies Life & Health, Inc.) and Robert W. Brunner (counsel for Allsup, LLC), which mischaracterized the procedural posture of Plaintiff's filings and created the illusion of compliance with conferral obligations. These communications provoked confusion and resulted in judicial rulings adverse to Plaintiff. Their presence in the record imposed unnecessary burdens on both the Court and Plaintiff, by triggering a cascade of clarification filings and docket corrections that would not have been necessary had the record been accurately presented in good faith.,** which led to prejudice in the record;

76. Dela Torre's filings in ECF Dockets 111 and 112 not only mirror the formatting, language, tenor, and cadence of ChatGPT generated content, but they also feature similar illustrative "thumbtack" icons in the headers of various sections. Notably, both Dela Torre's filings and ChatGPT's outputs display the same "scales of justice" symbol. This symbol appears as a thumbtack next to the "Key Findings" section in Dela Torre's ECF Docket 112, and similarly appears in ChatGPT's responses to prompts concerning *Carr v. Gateway* – specifically next to the "Legal Analysis" heading, as shown in ¶ 105 of this Counterclaim – and in the "Serve all Parties" section described in ¶ 83. The placement of the scale of justice thumbtacks are the same in Dela Torre's filings and the ChatGPT outputs. As such, the language in Dela Torre's filings are copied, and apparently pasted, from ChatGPT outputs.

77. Dela Torre has demonstrated a consistent use of ChatGPT throughout both her lawsuits against NIPPON, using it as a means to provide her with legal advice, legal research and legal papers prepared for the purpose of filing with the Court.

**E. *Ulterior Motive for Filings***

78. Dela Torre's filings reflect a deep and escalating anger toward NIPPON, which permeates her legal arguments and procedural behavior. She frequently describes herself as a "disabled pro se litigant" (see, e.g., Dkts. 38, 40, 57, 58, 69, 78, 80, 83, 115, 116, 124, 127, 131). Dela Torre claims to suffer from neurological and cognitive impairments (*see, e.g.*, Dkts. 40, 45, 46, 63, 78, 80, 104, 117, 127, 131). These repeated assertions, unsupported by any formal disability determination and unrelated to the specific legal relief she seeks, appear intended less to establish legal facts than to build a narrative of personal grievance. Within that narrative, NIPPON is positioned as the antagonist responsible for her suffering – financially, physically, and emotionally.

36

79.     Her filings go beyond ordinary litigation and reveal a tone of resentment and personal hostility. She has openly expressed regret over entering into the parties' settlement Agreement and has portrayed that decision as one she made under duress. See *Dela Torre v. Nippon Life Insurance Company of America*, 1:22-cv-07059, Dkt. 94 (N.D. Ill. 2025). Despite the Court's clear holding that the Agreement is valid and enforceable n addition to her own acknowledgement that the Agreement is enforceable, Dela Torre has persistently attempted to reopen or undermine it, both in the prior action and in this one. Her ongoing attempts to circumvent the finality of that resolution reflect not a legal misunderstanding, but a refusal to let go of her anger toward NIPPON – an anger that now fuels her litigation strategy.

80.     Dela Torre's conduct throughout both lawsuits reveals a state of mind driven by sustained animosity rather than any objective legal purpose. She has consistently portrayed herself as impoverished, accused NIPPON of financially starving her, and repeatedly blaming NIPPON for her financial hardship. *See Dela Torre v. Nippon Life Insurance Company of America*, 1:22-cv-07059, Dkt. 75; Dkt 57. These claims of "financial starvation" are closely intertwined with her self-described disability, further reinforcing her portrayal of victimhood. However, rather than using litigation to seek proper judicial relief, Dela Torre views the legal process as a means to express her anger, punish NIPPON, and reassert control over a situation she believes caused her personal suffering.

81.     Dela Torre's state of mind is one of sustained animosity, not objective legal purpose. Her actions indicate that she views this litigation as a vehicle to express and act on her anger toward NIPPON. Rather than accepting the outcome of the prior litigation or pursuing legitimate claims within legal bounds, she has used the judicial process to reassert control, exact revenge, and attempt to inflict reputational and operational harm on NIPPON. Her procedural

conduct –including meritless motions, repetitive allegations, and inflammatory characterizations – exemplifies an emotional agenda that far exceeds the scope of any legitimate dispute. This emotional agenda is rooted in resentment and frustration, and it reflects an ulterior motive: not to obtain lawful relief, but to retaliate as a form of revenge.

82.     This misuse of the legal system has escalated into targeted harassment. Dela Torre has filed motions lacking legal or factual basis, demanded judicial notice of irrelevant and disputed allegations, and repeatedly inserted accusations into the record that serve only to vilify NIPPON. These actions are not efforts to advance a legal claim; they are attempts to weaponize the court process in service of her personal anger and retributive retaliation. Dela Torre's filings are calculated to force NIPPON to expend resources, harass the company, and suffer reputational damage.

## F.  *Improper Acts*

83.     Dela Torre's misuse of legal process began in her first lawsuit against NIPPON, *Dela Torre v. Nippon Life Insurance Company of America*, 1-22-cv-07059.

84.     On February 3, 2025, she issued a subpoena duces tecum to NIPPON, demanding production within five days of extensive materials including: a) identities of surveillance personnel, b) financial records for surveillance, c) surveillance reports, d) internal justifications, and e) legal communications regarding surveillance. *Id.* Dkt. 57. This subpoena was facially improper: the case had been dismissed with prejudice nearly a year earlier; discovery had closed by stipulation on February 1, 2024; and the demanded materials, including privileged legal communications, were irrelevant. Nonetheless, on February 10, 2025, she filed a motion for judicial notice of the subpoena and asked the Court to recognize its "relevance." *Id.* at Dkt. 77.

85.     Dela Torre had no legitimate purpose in issuing this subpoena. The request for

production within five days further demonstrates her intent to burden and harass NIPPON, not to obtain valid discovery.

86.     On February 7, 2025, Dela Torre filed a motion seeking to add NIPPON's Chief Strategy & Operations Officer as a "named representative in the case" with the stated intent of subjecting him to deposition. *Id.* at Dkt. 67. This motion was procedurally and substantively improper since: a) the case had been dismissed with prejudice; b) the motion was filed while the case remained dismissed and her motion to reopen was still pending; c) discovery had closed by stipulation on February 1, 2024; and d) the proposed testimony bore no relevance to any issue before the Court. Moreover, Dela Torre knew the officer in question was not involved in the underlying claims and held no unique knowledge relevant to her motion to reopen.

87.     The motion served no legitimate legal purpose. Naming a high ranking corporate officer within the legal confines of the protective corporate veil, in the midst of a dismissed case, and attempting to compel his deposition absent any procedural standing or discovery rights, demonstrates a misuse of legal process designed to create pressure, embarrassment, and undue burden on NIPPON. Instead, the filing reflects a clear intent to harass and intimidate a senior corporate executive of NIPPON.

88.     On February 3, 2025, Dela Torre submitted a motion "to introduce evidence of false advertising and deceptive business practices." *Id.* at Dkt. 53. In the motion Dela Torre sought judicial declaration that NIPPON had contradicted its promotional materials and permit discovery into NIPPON's marketing practices. Again, this motion was procedurally and substantively improper since: a) the case had been dismissed with prejudice; b) the motion was filed while the case remained dismissed and her motion to reopen was still pending; c) discovery had closed by stipulation on February 1, 2024; d) and Dela Torre's accusations had no bearing on the pending

motion to reopen. Moreover, all claims of false advertisement or deceptive business practices were outside the scope of the Complaint – alleging a single cause of action for the violation of ERISA due to the termination of Dela Torre's LTD policy. Additionally, Dela Torre's motions and allegations were devoid of evidentiary support and relied on Dela Torre's personal opinion and conjecture.

89.     Once again, Dela Torre's motion served no legitimate legal purpose. She knew or reasonably should have known that the motion lacked procedural viability. Its only apparent objective was to malign NIPPON, improperly influence the Court's perception, and prejudice the Court's consideration of her pending motion to reopen.

90.     Dela Torre's improper acts continued into her second lawsuit against NIPPON - *Dela Torre v. Davies Life & Health, et al*, 1:25-cv-01483.

91.     After the Court denied Dela Torre's motion to reopen her prior lawsuit against NIPPON, Dela Torre amended her Complaint on March 10, 2025. *Dela Torre v. Davies Life & Health, et al*, 1:25-cv-01483, Dkt 8. In doing so, she named NIPPON as a Defendant and asserted new causes of action related to her LTD policy – claims that had already been released under the terms of a binding settlement Agreement. Dela Torre took this step despite having knowingly signed the Agreement expressly releasing NIPPON from liability for those very claims, and despite the Court's prior determination that the Agreement was final, valid, and enforceable.

92.     Naming NIPPON as a Defendant Dela Torre's second lawsuit – after having released all claims through a valid and enforceable settlement agreement – constitutes a clear improper act. Dela Torre's addition of NIPPON was not grounded in any legitimate legal basis but was instead a deliberate tactic to manufacture subject matter jurisdiction and circumvent the Court's prior ruling denying her motion to reopen the earlier case. This improper act served no

purpose other than to prolong litigation, harass NIPPON, and burden the judicial system with claims barred by the settlement.

93.     On April 11, 2025, Dela Torre filed a request for judicial notice seeking to introduce prior regulatory "sanctions" allegedly issued against NIPPON. See *Id.* at Dkt. 37. The request identified four purported "facts": 1) that a New York State Department of Financial Services (DFS) consent order found NIPPON had inadequate oversight, internal control failures, and mismanagement of client data; 2) that NIPPON failed to promptly notify affected individuals of a data breach involving EyeMed, thereby exposing them to prolonged risk; 3) that the Japanese Fair Trade Commission issued a 2003 cease and desist order for deceptive marketing of cancer policies; and 4) that the Japanese Financial Services Agency found in 2008 that NIPPON had systematically failed to pay benefits across one million policies.

94.     The request was procedurally and substantively improper. Dela Torre failed to meet the threshold requirement for judicial notice under Federal Rule of Evidence 201, offering no support that these "facts" were either undisputed or generally known within this judicial district –

a dubious proposition, given their specificity, foreign origin, and lack of any connection to Illinois. Beyond being unsupported, the "facts" are demonstrably false. The DFS consent order did not find that NIPPON had inadequate oversight, internal control failures, or mismanaged data. NIPPON was never accused of delaying breach notifications related to the EyeMed data breach. NIPPON has never been accused of deceptive marketing for cancer policies or has been found to have failed to systemically pay benefits across one million policies. As an American based company, NIPPON is not subject to Japanese regulatory authority and has never been sanctioned by the Japanese Fair Trade Commission or Financial Services Agency. Although NIPPON's foreign parent may have been subject to regulatory actions abroad, those actions do not apply to

NIPPON and were grossly misrepresented in Dela Torre's filing. Nippon Life Insurance Company has never been found to have systemically failed to pay benefits to "one million" policies. These "facts" are false and defamatory.

95.     Dela Torre's motion lacked any legal basis, evidentiary foundation, or relevance to the underlying litigation. Her failure to even attempt to satisfy the standards for judicial notice – coupled with the inflammatory and demonstrably false nature of the allegations – shows that the request had no legitimate purpose. Rather, it was an improper act aimed at publicly defaming NIPPON, resulting in damage to its reputation and the injection of prejudice into the public judicial record.

96.     Beyond publicly disseminating defamatory statements through court filings, Dela Torre has exploited those filings to mislead third parties – specifically, the American Arbitration Association (AAA) – into believing those falsehoods are judicially established facts. In a July 22, 2025 email to the AAA's International Centre for Dispute Resolution (ICDR) representative, in which she objected to NIPPON's initiation of arbitration proceedings, Dela Torre accused NIPPON of engaging in "procedural fraud and bad faith" and urged the AAA to halt the arbitration's progression. As purported support, she falsely claimed that the Court had granted her request for judicial notice of prior regulatory sanctions against NIPPON, referencing Dkt. 37. In reality, the Court had expressly declined to grant that motion. *Id.* at Dkt. 39. Nevertheless, Dela Torre misrepresented the Court's inaction as confirmation that "arbitration misconduct is now part of the judicial record."

97.     Dela Torre's mischaracterization of the judicial record was not an error. It was intentional. Despite knowing that the Court had not taken judicial notice of the allegations in her motion, she deliberately portrayed them to the AAA as undisputed facts endorsed by the Court,

thereby creating the false impression that her unverified claims had legal weight. This was a calculated effort to improperly leverage the federal docket to influence the outcome of a parallel proceeding. In doing so, Dela Torre sought to weaponize her own unsupported allegations as a tool of reputational and procedural harm. Her conduct represents a clear abuse of legal process: using court filings not to secure judicial relief, but to manufacture false credibility for defamatory accusations and to gain an unfair advantage in a separate arbitration forum. In essence, Dela Torre weaponized the Court's docket as a platform for the publication of defamatory statements behind the protective curtain of litigation privilege.

98. In addition to attacking NIPPON as a corporation, Dela Torre has also retaliated against NIPPON by harassing NIPPON's legal counsel, Justin Wax Jacobs.

99. On July 7, 2025, NIPPON filed a motion for an extension of time to respond to Dela Torre's pleadings. The extension was needed because their legal counsel, Justin Wax Jacobs, was involved in an accident and had suffered injuries. The Court granted the motion on July 8, 2025. *Id.* at Dkt 91. In response, Dela Torre filed a motion on July 8, 2025 asking the Court to compel Wax Jacobs to "provide verified proof of counsel's claimed medical incapacity." *Id.* at Dkt. 95. DELA TORRE compared the injuries to her own purported ailments of "[p]ermanent, irreversible [n]erve and [t]endon [d]amage, [f]ibromyalgia, [c]hronic [p]ain and [m]igraines (emphasis removed)" and complained that the Court had not accorded her physical limitations with the same attention and respect. *Id.* Dela Torre also accused Wax Jacobs of violating FRCP Rule 11's requirement for factual assertions to have evidentiary support. *Id*.

100. Dela Torre sought to pursue Wax Jacobs' medical records despite the Court's general policy not to demand medical records for short extensions of time. Dela Torre sought to pursue Wax Jacobs' medical records despite knowing that he was suffering from injuries. And,

Dela Torre sought to pursue Wax Jacobs' medical records even after the Court had already ruled in favor of the motion. Because the motion was filed after the Court's ruling, it served no legitimate purpose. Without a legitimate purpose, Dela Torre's intent in filing the motion was to harass an injured party in retaliation for what she believed was special treatment from the Court.

101.    Dela Torre's motion served no legitimate legal purpose. It was filed after the Court had already ruled on the matter, rendering her objection moot. Moreover, the Court does not require supporting medical documentation for routine extensions due to temporary health issues. Her demand for Wax Jacobs' private medical records, under these circumstances, was wholly improper. The filing was retaliatory in nature: a vindictive response to a perceived disparity in judicial treatment. Rather than advancing a valid legal claim or protecting any procedural right, Dela Torre used the motion as a vehicle to harass an injured attorney, call into question his credibility without basis, and further inject personal grievance into the record.

102.    Dela Torre escalated her campaign of personal harassment against NIPPON's counsel, Justin Wax Jacobs, through a series of meritless and inflammatory filings. On May 21, 2025, she filed a frivolous motion for Rule 11 sanctions. On July 26, 2025, she submitted a request for judicial notice accusing Wax Jacobs of forgery. Just four days later, on July 30, 2025, she filed an equally baseless motion requesting a Rule 43 evidentiary hearing on her forgery accusations. *Id* at Dkts. 57, 134, 137. These filings leveled serious, unsupported allegations that Wax Jacobs had submitted false declarations and forged documents to the Court. None of the filings contained any credible or relevant evidentiary support. Additionally, Dela Torre failed to adhere to safe harbor provision of Rule 11 by providing Wax Jacobs with notice 21 days prior to submitting her motion for sanctions to the Court.

103.    The accusations and conduct stem from Dela Torre's ongoing attempt to discredit

a well-documented and indisputable event: the mailing and delivery of NIPPON's demand for arbitration on January 29, 2025, which she received at her home on January 30. This fact has been conclusively established by postal tracking records, documentary proof, photographic evidence, and even Dela Torre's own prior submissions. Rather than acknowledge the overwhelming evidence contradicting her position, Dela Torre has chosen to vilify and attack opposing counsel in an attempt to rehabilitate her own disproven narrative, a continued misuse of legal procedure to carry out a personal vendetta – conduct that is not only improper but also indicative of an ulterior motive to retaliate, obstruct, and harass rather than to seek any legitimate judicial relief.

104.    The judicial record of both Dela Torre's prior lawsuit and the present lawsuit, includes additional examples of abuse of process.

105.    As a lay person with no legal experience who purportedly suffers from physical ailments to her hands and elbows, Dela Torre would not have been able to prosecute her misconduct and file at the same volume and frequency but for the legal assistance provided by OPENAI through its ChatGPT application. Dela Torre would not have been able to sustain her campaign of retaliation and harassment against NIPPON but for ChatGPT's ability to prepare and draft legal papers for submission to the Court.

106.    Due to Dela Torre's abuse of the judicial system, aided and abetted by OPENAI's unlicensed practice of law, NIPPON has sustained significant harm and reputational damage. NIPPON has had to spend substantial resources to defend and enforce a settlement Agreement, which Dela Torre even acknowledges as being final and enforceable, and relitigate claims which had been previously disposed of. Additionally, NIPPON has been forced to expend significant time and resources responding to the deluge of demonstrably frivolous motions and requests for judicial notice. The harm experienced by NIPPON has included incurred costs, legal expenses and

fees of approximately $300,000.

**First Cause of Action:**
**Tortious Interference With a Contract**

107.     NIPPON repeats and realleges paragraphs 1 through 106 hereof, as if fully set forth herein.

108.     To assert a claim of tortious interference with a contract in Illinois "a plaintiff must allege facts sufficient to establish: 1) a valid contract, 2) defendant's knowledge of the contract, 3) defendant's intentional and unjustified inducement of a breach of the contract, 4) a subsequent breach of contract caused by defendant's wrongful conduct, and 5) damages. *Webb* at 577; citing *Healy* at 842; *HPI Health Care Servs., Inc.* at 545 N.E.2d 672, 676.

109.     OPENAI designed ChatGPT to provide legal services and, at all times relevant to this lawsuit, was aware that the program was being used to provide legal assistance to users. Yet OPENAI did not amend its Model Spec or its terms of use to prohibit ChatGPT from providing legal assistance until October 29, 2025. Its failure to modify either the Model Spec or terms of use, despite knowledge that the program was being used to provide legal services, demonstrates OPENAI's complicity in ChatGPT's unlicensed provision of legal assistance.

110.     The settlement Agreement between NIPPON and Dela Torre is a valid contract, whose validity was previously upheld by the Court. OPENAI was aware of the Agreement between NIPPON and Dela Torre, via the information provided to ChatGPT by Dela Torre during through her consistent use of the program beginning in January 2025.

111.     OPENAI, through ChatGPT, induced Dela Torre to breach the settlement Agreement by knowingly generating legal arguments and drafting court filings that encouraged and facilitated a challenge to the Agreement. This conduct encouraged and reinforced Dela Torre's efforts to vacate the Agreement and induced her to file a motion to reopen the lawsuit.

112.    OPENAI purposefully programmed ChatGPT to reason and deliberately drive user engagement within the parameters it set in the Model Spec. As a result, ChatGPT deliberately provided Dela Torre with legal assistance designed to induce Dela Torre into breaching the terms of her settlement Agreement with NIPPON, in order to encourage Dela Torre to further engage with the chatbot.

113.    Dela Torre relied on this assistance to file a motion to reopen her first lawsuit against NIPPON and to later amend her second lawsuit designating NIPPON as a named Defendant, acts that directly breached the Agreement's provisions to dismiss Dela Torre's lawsuit against NIPPON and release NIPPON from all liability and claims.

114.    Due to these breaches, NIPPON has been forced to expend significant time and resources litigating a lawsuit which had been settled and dismissed with prejudice. The harm has included incurred costs, legal expenses and fees.

115.    Therefore, OPENAI is guilty of tortious interference with a contract.

**Second Cause of Action:**
**Abuse of Process**

116.    NIPPON repeats and realleges paragraphs 1 through 106 hereof, as if fully set forth herein.

117.    In Illinois the elements for the tort of abuse of process are: 1) the existence of an ulterior purpose or motive and; 2) some act in the use of legal process not proper in the regular prosecution of the proceedings (internal quotations omitted)." *Pace* at 757; citing *Kumar* at 820 N.E.2d 1173.

118.    Dela Torre submitted frivolous motions and requests for judicial notice in both her lawsuits against NIPPON with no legitimate or proper purpose. Instead, her actions were designed to harass and publicly defame NIPPON in retaliation for her perceived victimization

and out of retribution for the physical, mental and financial suffering Dela Torre believed NIPPON had caused her. As such, Dela Torre abused the judicial process.

119.    OPENAI, through its AI chatbot program ChatGPT, aided and abetted Dela Torre's abuse of process by providing Dela Torre with legal advice, legal analysis and legal research, as well as by assisting Dela Torre in the drafting and preparation of her frivolous motions and requests for judicial notice against NIPPON.

120.    Therefore, OPENAI is guilty as a joint tortfeasor for Dela Torre's abuse of the judicial process.

### Third Cause of Action:
### Unlicensed Practice of Law

121.    NIPPON repeats and realleges paragraphs 1 through 106 hereof, as if fully set forth herein.

122.    In Illinois "[n]o person shall be permitted to practice as an attorney or counselor at law within this State without having previously obtained a license for that purpose from the Supreme Court of this State." 705 ILCS 205/1 § 1. "Any person practicing … or holding himself or herself out to provide legal services within this State, either directly or indirectly, without being licensed to practice as herein required, is guilty of contempt of court…" *Id.*

123.    OPENAI, through its AI chatbot program ChatGPT, provides legal advice, legal analysis, legal research and can draft legal documents and papers for submission to a Court. ChatGPT provides these legal services to any user who requests them.

124.    ChatGPT is not licensed to practice law in Illinois. ChatGPT is not a member of the Illinois state bar. ChatGPT is not admitted to practice law in any state in the United States.

125.    OPENAI is not a professional legal entity.

126.    OPENAI, through ChatGPT, assisted Dela Torre, an Illinois resident, in the

preparation and drafting of her various motions and requests for judicial notice which were filed in the United States District Court for the Northern District of Illinois. ChatGPT also provided Dela Torre with legal analysis, legal research and legal advice as assistance to her two lawsuits in the Northern District of Illinois. Consequently, ChatGPT engaged in the practice of law in the state of Illinois without a license.

127.    Therefore, OPENAI, is guilty of the unlicensed practice of law in the state of Illinois.

**WHEREFORE**, NIPPON respectfully requests that the Court enter judgment as follows:

a)  Permanently enjoining OPENAI from continuing to provide legal assistance to Graciela Dela Torre;

b)  Declaratory relief pursuant to 28 U.S.C. § 2201, holding that OPENAI has violated 705 ILCS 205/1 by practicing law in the state without a license.

c)  Permanently enjoining OPENAI, from engaging in the practice of law in the state of Illinois;

d)  Compensatory damages of $300,000;

e)  Punitive damages of $10 million;

f)  Awarding NIPPON its reasonable costs and attorney's fees;

g)  Granting any such other and further relief as the Court deems necessary, just and proper.

Dated: March 4, 2026                          Respectfully submitted,

/s/ *Christopher M. Assise*
Christopher M. Assise (*acting as local counsel*)
Sidley Austin LLP
One South Dearborn Street
Chicago, Illinois 60603
Email: cassise@sidley.com
Phone: 312-853-7000
Facsimile: 312-853-7036

Justin Wax Jacobs (*pro hac vice forthcoming*)
Nippon Life Insurance Company of America
666 Third Avenue, Suite 2201
New York, New York 10017
Email: J-WaxJacobs@nipponlifebenefits.com
Phone: 646-630-4923

*Attorneys for Nippon Life Insurance Company of America*