# Exhibit C

Everlaw

Schedule a Meeting      Product      Solutions      Customers      Resources      Sign In

# Judges Share Their Perspectives on Generative AI and the Law at Everlaw Summit

by Justin Smith

Reading Time — 8 minutes

December 3, 2024

 

T he courtroom is one of the few places that, upon entering, you know exactly where you are.

There are the church-like pews lining the aisle, the fluorescent lights casting their artificial glow, the wooden gavel lying in wait, the uniformed bailiff standing guard, the oversized bench from which the judge presides in their flowing black robes.

Your voice lowers, your footsteps soften, your body tenses, your senses heighten.

And yet, although courtrooms are still where the rule of law is upheld and the gears of the legal system grind, in our post-Covid world, the virtual court has emerged as a viable alternative for the judiciary.

Add to that the explosion in the amount of discoverable data, the ever-evolving role of ediscovery, and new types of technology like generative AI, and it's safe to say the 21st century courtroom—and the judge that presides over it—has a lot on its plate.

At Everlaw Summit, the Hon. Rebecca Pallmeyer (N.D. Ill.), Hon. Allison Goddard (S.D. Cal.), and Hon. Evette Pennypacker (Santa Clara County, Cal.) spoke with Everlaw CLO Gloria Lee about changes in the legal profession during their time on the bench, what they think about its current state, and where they see things going next.



FROM LEFT: EVERLAW CLO GLORIA LEE, HON. GODDARD, HON. PENNYPACKER, HON. PALLMEYER

## Technology as a Leveler

Looking for additional resources?

Head on over to our Resource Center for webinars, white papers, reports and more!

Check out Resource Center

Schedule a Meeting

Recorded for QA. AI content may be inaccurate and isn't legal advice. Review our Privacy Policy here

Speaking at EveLaw summit, the judges began the conversation by discussing just how much technology has changed the discovery process since they've started practicing, going from the days of bankers boxes and overstuffed file folders to the present.

They were quick to point out that, while this fast-moving technological advancement has been largely a good thing, there's also another side to it, with some attorneys and judges who aren't able to keep up with the pace of change, or aren't interested in learning how the technology can help.

"Typically, the lawyers who are doing smaller cases that don't really involve any sort of technology have been doing them for a long time, and it might be hard for them to learn the technology, so they almost can't make a business case for it," Judge Goddard said. "And right now, it feels almost like when word processing technology first came out, and there were people who resisted, but eventually there was a case to be made for people to change and learn it. So I'm hoping as technology continues to develop, one of things it does is scale to the point where you simply have to adopt it, even in the less complex cases."

## "I think being comfortable with and knowing how to use technology is a differentiator."

SHARE THIS QUOTE:

There's a similar hesitancy from the judicial perspective, simply because they haven't needed to use technology. This was especially true before Covid, when nearly all the court processes were handled in person, and was laid bare when proceedings were forced to go remote. And while some judges, like those on our panel, can say they're at least aware of the technology popping up in their courtroom, not all judges can. To combat this, the judges agreed that patience is the best solution.

"You need to be patient with your judge," Judge Pallmeyer said. "Your judge may be hugely sophisticated when it comes to technology, but they also might not be. Or your judge may be pretty sophisticated, but the equipment doesn't work that well, or the staff screws up, or there's a power problem, or there's an internet problem. There are all kinds of things that could go wrong. So you really do need to be patient with helping us along and realizing it may not go as smoothly as we want it to."

Coupled with that patience and need for learning, however, is the inevitability that technology is now an unavoidable part of the legal system in the United States. And for attorneys, understanding it will likely make the difference in providing effective counsel.

## "I'm so excited about the potential of generative AI."

SHARE THIS QUOTE:

As Judge Goddard mentioned, there's even a business case to be made for learning how to use technology. Since many law firm clients, especially on the defense side, are already using so many different forms of technology in their daily course of business, they almost expect their legal counsel to be tech savvy as well. And for plaintiffs, it can help separate them in the choosing of lead counsel.

"I think being comfortable with and knowing how to use technology is a differentiator," Judge Goddard said. "If you're able to demonstrate that you've been able to harness technology in a way that's going to make you better and more efficient, it can really help separate yourself. For plaintiffs' firms especially, you can make a case that being familiar with technology is going to help you represent your clients more effectively, which can benefit you in the judges eyes when it comes to appointing lead counsel."

Technology can help not just attorneys and judges, but even litigants get on an even playing field, leading to more just and equitable outcomes.

"In many ways, technology is a great leveler," Judge Pallmeyer said. "For example, you can have someone who otherwise might have difficulty getting to the courthouse, who's now able to appear at a hearing online. You can even see pleadings from pro se litigants that read like the real thing, because they've gotten access to software that helps them write it. Of course, a little knowledge is a dangerous thing, and we have to be careful about what those people are saying, but overall it's certainly beneficial."

# The Potential of Generative AI

As Gloria pointed out, hardly any conversation centered around technology in the legal system can be had without mentioning generative AI. Now that many organizations are planning for and incorporating it into their workflows, it's only a matter of time before it starts significantly impacting both the ediscovery process and litigation itself.

One thing all of the judges mentioned was that first and foremost, generative AI is a tool to help supplement legal work, not replace legal practitioners. It's there to help you work smarter and more efficiently, not do everything for you or take your job.

"I'm so excited about the potential of generative AI," Judge Goddard said. "But I say this with every technology, it's a great tool. It isn't going to change the fact that most lawyers practice law in a good way, and will use generative AI responsibly, and the bad lawyers will probably just continue using it to be bad lawyers. That said, I think it can help in a lot of ways, like increasing access to justice, bringing down the cost of litigation, and helping judges do their jobs better."

For state courts specifically, where funding challenges and an overwhelming amount of cases often leave them on the back foot, generative AI can really drive change.

"Using generative AI can help increase both the quality and quantity of state court output, and increase the depth with which we could get into a particular case," Judge Pennypacker, a state court judge herself, said. "Because our time and resources are so limited, we have to pick and choose what we spend the most time on, and this could really help with that."

The advantages and potential stretch to practically every corner of the law, including, as Judge Pallmeyer pointed out, to IP litigation, where a near limitless inventory of prior art can be difficult to search through completely when in the middle of a case.



HON. PALLMEYER (FAR RIGHT) SPEAKS DURING EVERLAW SUMMIT '24.

"When it comes to generative AI in IP litigation, for example," Judge Pallmeyer said. "There's the problem of finding prior art when you're making an application for a patent. And it's not unusual that we end up finding out about some prior art that should've been presented to the patent office during the initial infringement case. This problem could easily be addressed with generative AI. Same with respect to reviewing deposition transcripts or briefs. Obviously, there are also huge pitfalls there, but, while we certainly have to guard against the downsides, we also have to appreciate the upsides."

# The Power of Deepfakes

One of the downsides that often arises when discussing generative AI in the courtroom is the overwhelming power of deepfakes.

With apps on your smartphone, it has become frighteningly simple to create deceptive videos and voice messages that look and sound like the real thing. For example, Reface is an image deepfake app with millions of reviews on the Google and Apple app stores, which allows users to swap faces with celebrities or characters in videos. Additionally, VoiceAI, an audio deepfake app with over 500,000 downloads, can create audio messages in the voice of a celebrity. Both of these can be downloaded for free and take no training or skill to use.

One of the places where deepfakes pose a very real threat is in family court, where many of the litigants are pro se, emotions are running high, and decisions must be made quickly. These cases often fall under the purview of state courts, which typically don't have the funding or the time to properly vet every piece of digital evidence that comes their way.



JUDGE ALLISON GODDARD SPEAKS DURING EVERLAW SUMMIT '24.

"These days, you can use an app to make it appear like you have bruises on your face," Judge Pennypacker said when describing the ease with which these deepfakes can be created. "You can make it look like two people in a picture together are kissing. You can create a video of a fight scene. It's not that difficult to put together, and people can be very motivated. For example, if you have a domestic violence accusation against you, you can't get alimony or have custody of your kids, so there's a huge motivation for these people, who are in a very emotional state, to use this technology to manipulate the truth."

To combat this, the judges agree, they first and foremost have to be educated about this technology and the ways in which it might show up in their courtroom.

"The first step to solving this issue is that we have to educate the bench," Judge Pennypacker continued. "Judges have to understand that is an issue, and that they should be thinking about basic rules of corroboration, like whether it's realistic an alleged incident happened, or if there's other evidence indicating a party was present at a certain time and place. I think ultimately we can rely on our existing rules of evidence and authenticity, but we also have to be aware that it's a problem to begin with."

Although it might seem like a futuristic problem, deepfakes are already becoming a prominent issue in courtrooms around the world. And more than validation technology or other detection features, education will be one of the most important ways to counteract the problem.

# Generative AI's Impact on Legal Education

Along that theme of education, there's a growing feeling that generative AI can contribute to the development of the next generation of lawyers and judges in a meaningful way. It represents yet another exciting use case for this technology, the benefits of which are just starting to emerge.

"Training is expensive because law is expensive," Judge Pennypacker said. "If you don't have a lot of resources, generative AI can be incredibly helpful for the legal profession. You can learn about the mechanics of things in a way that you wouldn't necessarily learn about in law school."

"This is the moment you can distinguish yourself and place yourself at the forefront of this evolving landscape."

SHARE THIS QUOTE:

However, despite this positive outlook, the judges were also careful to express caution over the fact that generative AI is not a direct replacement for valuable, in-person training.

"I do have some hesitations about leaning on generative AI too much during the education process," Judge Pennypacker continued. "I remember when I was still practicing as an attorney, and Lexis and WestLaw were getting popular. The new lawyers coming into the firm would run searches, and only paid attention to the parts of the case that came back with the language that matched their search. We had to teach them that the whole case matters, and you have to know all of it. So I worry that students aren't developing that muscle of intellectual rigor that you need to be a lawyer, because they aren't diving into cases as comprehensively as they should."

This was echoed by Judge Pallmeyer, who spoke to both the positives and potential drawbacks generative AI might present new lawyers in their legal education.

"There are enormous opportunities, and I think we'll see the newest lawyers leading the way," Judge Pallmeyer said. "There's no question that, with respect to substance, and even style, generative AI can help lead. However, there is always something lost when you don't have those organic, in-person, one-on-one meetings that many of us are accustomed to. Now, that can be both a loss and a gain, so keeping an open mind is important."

The balance for the legal profession will be in figuring out how to ensure attorneys are well-versed in generative AI and know how and when to leverage it as a tool, with the work that can only be learned by actually getting into the nuts and bolts of the case.

# A Look Ahead for the Legal Profession

As the panel came to an end, each of the judges were asked by Gloria to offer a final take on generative AI and where they see the future of the legal profession going. Each judge spoke to the idea of technology being a great tool, but also cautioned that, despite this online world our society has now embraced, there's still a need for institutions like the courts to be treated with respect.

"Remember that, even online, a courtroom is still a courtroom," Judge Pallmeyer said. "There's great dignity in the court system, and we don't want to lose that."

Judge Pennypacker agreed with this sentiment, and echoed the need for patience mentioned earlier in the conversation.

"Regardless of whether you're calling in remotely on your phone or you're sitting in the courtroom, a hearing is still a hearing, and it's imperative to be respectful," Judge Pennypacker said. "And for attorneys, assume the courtroom won't have the resources you need to put on your multimedia presentation, and build in time for that. Assume the judge won't know all of the technology you're using or talking about, so be prepared to answer questions. Just be open, kind, patient, and prepared."

And, although much of the conversation centered on judges and attorneys' use of generative AI, Judge Goddard closed with more pointed advice to the litigation support professionals that often serve as the engine behind many organizations, and who made up a healthy contingent of the Summit audience.

"This is the moment for litigation support," Judge Goddard said. "This is the moment you can distinguish yourself and place yourself at the forefront of this evolving landscape. Don't be afraid of generative AI replacing you, but instead learn how to use it effectively. Demonstrate that it's your thought partner, and not your replacement."

 Justin Smith is a Senior Content Marketing Manager at Everlaw. He focuses on the ways AI is transforming the practice of law, the future of ediscovery, and how legal teams are adapting to a rapidly changing industry. See more articles from this author.

# Related Articles

 

| By Justin Smith | By Petra Pasternak | By Rachel Gonzalez | By Justin Smith | By Justin Smith |
| --- | --- | --- | --- | --- |
| AI & LAW | CHANGE MANAGEMENT | EVERLAW SUMMIT | AI & LAW | AI & LAW |

Case: 1:26-cv-02448 Document #: 15-4 Filed: 05/15/26 Page 7 of 8 PageID #:111



**Practical Takeaways on Generative AI from Everlaw...**
GenAI's impact on the legal profession was a major topic at Everlaw Summit '24.
7 MIN READ

**The Hidden Brain and the Legal Profession**
Shankar Vedantam on how unconscious bias influences legal decision making.
4 MIN READ

**Meet the Everlaw Summit '24 Award Winners**
The Everlaw Summit Awards recognize leaders and innovators across the legal profession.
5 MIN READ

**5 Things Legal Organizations Are Doing to Prepare f...**
Legal organizations are taking steps to prepare themselves for the generative AI era.
3 MIN READ

**Getting Practical With GenAI**
Watch Everlaw founder and CEO AJ Shankar's Summit keynote.
3 MIN READ

PRODUCT

# Everlaw Platform

# Everlaw^AI

# Deep Dive

# Storybuilder

# Pricing

# Security

AI SUITE

Deep Dive

Coding Suggestions

Writing Assistant

Review Assistant

Predictive Coding

Clustering

Translations

INDUSTRIES

Law Firms

Corporations

State & Local Gov

Federal Government

Everlaw for Good

USE CASES

Ediscovery

Early Case Assessment

Legal Holds

Trial Preparation

Data Privacy

Internal Investigations

FOIA & Public Records

CUSTOMER SUPPORT

Customer Resources

Support

Knowledge Base

Training

Everlaw Product Certification

Release Notes

RESOURCES

Resource Center

Everlaw Summit

Partner Directory

Integrations

Help Center

Training

Events

Blog

COMPANY

About

Press

Contact Us

Trust Center

WORKING AT EVERLAW

Careers

PARTNERS

Partner Program

Partner Directory

Partner Resource Center Login

LEGAL & PRIVACY

Legal Overview

Everlaw Integrity Line

POPULAR RESOURCES

An Introduction to Ediscovery

What Is Ediscovery Software?

A Complete Guide to Trial Preparation

What Is Early Case Assessment?

Novel Data Types: How Collaborative Tools Are Changing the Face of Ediscovery

The Modern Ediscovery Guide: Navigating Rules, ESI, and the EDRM

© Everlaw 2026

Privacy Notice

California Privacy Notice

Do Not Sell or Share My Personal Information

Visit UK Site